# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| REALPAGE, INC.; REALPAGE VENDOR COMPLIANCE LLC | § § § | |
| | § | Civil Action No. 4:16-CV-00737 |
| v. | § | Judge Mazzant |
| | § | |
| ENTERPRISE RISK CONTROL, LLC; LONNIE DERDEN | § § § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants Enterprise Risk Control, LLC and Lonnie Derden's Motion to Dismiss or, in the Alternative, Motion to Abate (Dkt. #11). After reviewing the relevant pleadings and motion, the Court finds the motion should be granted in part and denied in part.

## BACKGROUND

This dispute centers around the relationship between RealPage, Inc. ("RealPage") and Compliance Depot, L.L.C. ("Compliance Depot"). In the beginning, RealPage owned two subsidiaries: RP Newco II LLC ("RP Newco") and CD Newco LLC ("CD Newco"). Compliance Depot was a competitor and was owned by Lonnie Derden ("Derden"), Doug Clark ("Clark"), and G.P. Smits. RealPage and RP Newco purchased Compliance Depot in 2011. As part of the merger, Derden, Clark, and several other Compliance Depot employees joined RP Newco. Derden resigned from RP Newco a year after the merger. Eventually, RP Newco and CD Newco merged. Upon merging, RP Newco, as the surviving entity, changed its name to RealPage Vendor Compliance LLC ("RealPage Compliance").[1] In December 2012, Derden formed

---
[1] The merger took place on December 31, 2014. The certificate of merger stated that "upon the effectiveness of the merger" the surviving limited liability company shall be named "RealPage Vendor Compliance LLC" (Dkt. #17, Exhibit A).

Proactive Compliance, LLC. In March 2013, Proactive Compliance, LLC changed its name to Enterprise Risk Control, LLC ("Enterprise").

On May 5, 2011, RP Newco, with its parent RealPage (collectively, the "Buyers"), acquired substantially all of the assets of Compliance Depot, including the intellectual property, contracts, and tradenames (the "Purchased Assets") of Compliance Depot and its Significant Owners. To complete the purchase, the Buyers entered into an Asset Purchase Agreement ("Purchase Agreement"). The Purchase Agreement required Compliance Depot and the Significant Owners to execute a Significant Owners Agreement ("SOA"), an Employment Agreement, and other documents.

As part of the SOA, Derden and Clark assigned their rights and interests in Compliance Depot's intellectual property to the Buyers. The SOA's non-compete clause limited Derden's ability to engage in a "competing business" or solicit any business, client, customer, or employee away from the Buyers for a five-year period after the closing date, which was May 5, 2011.

The Employment Agreement between RP Newco and Derden provided that Derden would serve as "Vice President II" of RP Newco. The Employment agreement contained non-disclosure, non-compete, and non-solicitation clauses. The non-disclosure clause stated that for a five-year period following Derden's termination, he would not use, disclose, reproduce, or distribute RP Newco's "Confidential Information." The Employment Agreement's non-compete and non-solicit provisions were effective for a three-year period following Derden's termination. These periods were meant to complement restrictive covenants in the SOA. In other words, the SOA provisions governed all restrictions up until May 5, 2016, with the Employment Agreement restrictions governing any remaining period after May 5, 2016.

Derden resigned on June 29, 2012. In December 2012, Derden formed Proactive Compliance, LLC. Proactive Compliance, LLC changed its name to Enterprise in March 2013. At this time, five former employees of RP Newco, by way of the Compliance Depot merger, are employed by Enterprise.

Enterprise promotes itself as "the most advanced, feature-rich vendor management solution in the industry" based on "proprietary technology that no one can touch." Enterprise offers five vendor management products and services to eleven industries, including the real estate industry. Among its offered products and services are: insurance certificate management, credentialing, tax ID verification, vendor diversity, and electronic data management.

In the spring of 2014, Enterprise met with one of RealPage's clients in order to discuss Enterprise providing vendor compliance services and products once the non-compete expired.[2] Upon learning of the interaction, RealPage demanded that Derden cease and desist from any breaches of his non-competition, non-solicitation, and confidentiality obligations to RealPage. On April 1, 2014, Derden responded, denying that he used or disclosed RealPage's confidential information or that Enterprise was involved in the multi-family housing industry, which he viewed as RealPage's "core discipline." Derden also claimed that Enterprise's screening software was available "off the shelf."

On December 21, 2014, RP Newco changed its name to RealPage Compliance.

In January 2015, Enterprise began providing vendor management services to a company offering brokerage and property management services. On May 5, 2016, the SOA non-compete expired. This was just shy of four years after Derden resigned from RP Newco. The Employment

---

[2] It is not clear whether the client was actually RealPage, Inc.'s client or RP Newco's client. Both Plaintiffs' complaint and the email that forms the basis of this allegation refer to RealPage, Inc. and RP Newco generally as "RealPage" without any distinction when either entity is not involved (*See* Dkt. #1 at p. 1). This distinction does not appear to be material, however, and therefore the Court will use the terminology from the Complaint.

Agreement's non-disclosure remained in effect until June 29, 2017, five years after Derden resigned. On September 13, 2016, Enterprise's director of national accounts sent an email to one of RealPage's clients stating, "We have returned to the multi-family industry with the most advanced vendor compliance management application in the market" (Dkt. #1, Exhibit F)

On September 23, 2016, Plaintiffs filed their Original Complaint seeking injunctive and monetary relief for misappropriation of trade secrets against Derden and Enterprise (collectively, "Defendants"); breach of contract against Derden; and breach of fiduciary duty against Derden. (Dkt. #1). On October 1, 2016, Defendants filed this motion (Dkt. #11). On November 1, 2016, Plaintiffs filed a response (Dkt. #17). On November 7, 2016, Defendants filed a reply (Dkt. #23).

## LEGAL STANDARD

Defendants move for dismissal under Rule 12(b)(1) for lack of standing. Standing is a required element of subject matter jurisdiction under Rule 12(b)(1). *Roman Catholic Diocese of Dall. v. Sebelius*, 927 F. Supp. 2d 406, 415 (N.D. Tex. 2013). To have standing under Article III, a plaintiff must show that: (1) he has suffered concrete and particularized injury that is actual or imminent; (2) the injury is "fairly traceable" to the defendant's actions; and (3) the injury will likely be redressed if he prevails in his lawsuit. *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992). A plaintiff who raises multiple causes of action "must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citation omitted).

A Rule 12(b)(1) motion should be granted only if it appears beyond doubt that the plaintiff cannot prove a plausible set of facts in support of its claims. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). The Court should accept all well-pleaded allegations in the complaint as true and view those allegations in the light most favorable to the plaintiff. *Truman*

*v. United States*, 26 F.3d 592, 594 (5th Cir. 1994). When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the Court should consider the Rule 12(b)(1) motion before addressing other motions to dismiss. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam)). The Court's dismissal of a plaintiff's case because the plaintiff lacks subject matter jurisdiction is not a determination on the merits and does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction. *Id.*

Defendants also move for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal when the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in Plaintiff's complaint and view those facts in the light most favorable to Plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the complaint states a claim for relief that is plausible on its face. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court identifies and disregards conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

## ANALYSIS

### Standing

Defendants make various standing arguments based on the identity of the parties to the agreements and the Plaintiffs now before the Court. First, Defendants argue that RealPage Compliance cannot bring claims against Derden because Derden did not consent to an assignment of rights from RP Newco to RealPage Compliance. Second, Defendants argue that RealPage Compliance lacks standing because it did not buy the Purchased Assets under the Purchase Agreement. Finally, Defendants argue that neither Plaintiff has standing under the

6

Employment Agreement, and therefore Derden did not possess any "Confidential Information" that he allegedly stole.

Plaintiffs argue RealPage Compliance is the rightful owner of the Purchased Assets and did not need an assignment of rights because RealPage Compliance is merely a new name for RP Newco. Plaintiffs also argue RealPage may assert the claims of its wholly owned subsidiary, RealPage Compliance.

Plaintiffs have standing. First, "a contracting party that has merely changed its name is still a contracting party." *In re H&R Block Fin. Advisors, Inc.*, 235 S.W.3d 177, 178 (Tex. 2007). In the complaint, Plaintiffs refer to both RealPage, Inc. and RealPage Compliance as "RealPage" without mentioning RP Newco. However, in response to Defendants' motion, Plaintiffs explain the merger and attach the certificate of merger filed with the Delaware Secretary of State showing the merger of RP Newco and CD Newco and the subsequent name change of RP Newco, the surviving entity, to RealPage Compliance.[3] These facts, supported by evidence, are sufficient to show that RealPage Compliance is the same as RP Newco. Thus, RealPage Compliance has standing.

Defendants do not contest that RealPage has standing to assert the claims of its wholly owned subsidiary. It is also uncontested that RealPage Compliance is a wholly owned subsidiary of RealPage. Because the Court finds that RealPage Compliance has standing to assert claims against Defendants, RealPage has standing by virtue of its ownership of RealPage Compliance.

---

[3] Defendants object the Plaintiffs' use of the certificate of merger on the basis that Plaintiffs' counsel cannot authenticate the record because Plaintiff's counsel does not have personal knowledge of the record. The Court overrules the objection. The certificate of merger is maintained on the Secretary of State for the State of Delaware's website, it contains the seal, and a signature purporting to be an execution. Therefore, the certificate is self-authenticating under Federal Rule of Evidence 902(1).

Dispute Resolution Clause

Defendants argue that because Plaintiffs bought the Purchased Assets through the Purchase Agreement, Plaintiffs are bound by the Purchase Agreement's dispute resolution provision located in Section 8.9, which requires "direct negotiation" for any dispute between the parties "arising out of or related to [the Purchase Agreement]" (Dkt. #1, Exhibit A at p. 48).

Plaintiffs argue that the Purchase Agreement's dispute resolution provision does not apply because they sued under the Employment Agreement and SOA, but not the Purchase Agreement. In the alternative, Plaintiffs argue that even if the dispute resolution provision applies, it does not apply to the portion of the lawsuit seeking a preliminary injunction.

Courts liberally construe dispute resolution provisions. *Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 471 (5th Cir. 2002); *Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998) (citations omitted). A valid dispute resolution agreement applies to any claim unless it is certain "that [the] arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." *Pers. Sec. & Safety Sys. Inc. v. Motorola*, 297 F.3d 388, 392 (5th Cir. 2002).

Section 8.9(a) of the Purchase Agreement provides:

> No Party to this Agreement shall institute a proceeding in any court or administrative agency to resolve a dispute between the Parties arising out of or related to this Agreement before that Party has sought to resolve the dispute through direct negotiation with the other Party.

(Dkt. #1, Exhibit A at p. 48). The Supreme Court and Fifth Circuit have characterized similar clauses as broad clauses capable of expansive reach. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 397–98 (1967) (labelling as "broad" a clause requiring arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement"); *Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*, 138 F.3d 160, 164–65 (5th Cir. 1998) (holding that

when parties agree to an arbitration clause governing "[a]ny dispute . . . arising out of or in connection with or relating to this Agreement," they "intend the clause to reach all aspects of the relationship"). Broad dispute resolution clauses, like the Purchase Agreement's dispute resolution clause, are not limited to claims that literally "arise under the contract," but rather embrace all disputes between the parties having a significant relationship to the contract, regardless of the label attached to the dispute. *Pennzoil Expl. & Prod. Co.*, 139 F.3d at 1067. Therefore, the Purchase Agreement's dispute resolution clause contemplates that all disputes related to the purchase of the Purchased Assets will be negotiated and mediated, regardless of which ancillary contract forms the basis of Plaintiffs' suit.

Plaintiffs argue that the Employment Agreement has an "entire agreement" provision and a separate dispute resolution provision, therefore dispensing of the Purchase Agreement's dispute resolution agreement. The Court disagrees.

The Purchase Agreement has several provisions for its construction and definitions. Specifically, the Purchase Agreement provides that "[i]n the event of any conflict or inconsistency between the terms and conditions of this Agreement and any Ancillary Agreement, the terms and conditions of this Agreement shall prevail" (Dkt. #1, Exhibit A at p. 49). "Ancillary Agreement" is defined to mean "each agreement, certificate or other document specifically listed in subpart (c) or (d) of Section 2.10, which is executed or delivered in connection with the Closing by any or all of the Parties" (Dkt. #1, Exhibit A at p. (ii)). Section 2.10(c) specifically lists the Employment Agreement and the SOA, (Dkt. #1, Exhibit A at p. 9), therefore making those agreements Ancillary Agreements.

As an Ancillary Agreement, the Employment Agreement cannot have the effect of cancelling out Purchase Agreement provisions. The dispute flows from a series of interrelated

agreements entered into on the same day. The Purchase Agreement is essentially the master contract. The Purchase Agreement expressly requires Defendants to execute the Employment Agreement and SOA before the sale can go through. Conversely, the Employment Agreement acknowledges the Purchase Agreement as the basis for all of the ancillary agreements entered into that date (*See* Dkt. #1, Exhibit C at p. 1). Thus, the Employment Agreement entire agreement clause does not have the effect of cancelling out the Purchase Agreement because the Purchase Agreement expressly provides that Purchase Agreement is controlling.

Finally, Plaintiffs argue even if the Purchase Agreement's dispute resolution clause applies, the case should not be dismissed because of the injunction exception. Defendants do not respond to this argument in their reply.

Section 8.9(e) of the Purchase Agreement states that "[n]otwithstanding any other provision of this Agreement, including [the dispute resolution provision], each party shall have the right to at any time apply to any court of competent jurisdiction for preliminary injunctive relief" (Dkt. #1, Exhibit A at p. 48). Plaintiffs seek, among other things, a "preliminary and permanent injunction" (Dkt. #1 at p. 21). Section 8.9(e) allows Plaintiffs to seek a preliminary injunction and therefore the Court will not dismiss Plaintiffs' claim for preliminary injunctive relief. However, Plaintiffs' remaining claims are subject to the dispute resolution provision and are therefore abated in favor of the Purchase Agreement's dispute resolution provision.

## CONCLUSION

It is therefore **ORDERED** that Defendants' Motion to Dismiss (Dkt. #11) is **DENIED.**

It is further **ORDERED** that Defendants' Motion to Abate (Dkt. #11) is **GRANTED in part,** pending direct negotiation and mediation according to Section 8.9 of the Asset Purchase Agreement.

Plaintiffs' claim for money damages is hereby **ABATED** pending direct negotiation and mediation according to Section 8.9 of the Asset Purchase Agreement.

Plaintiffs' claim for preliminary injunctive relief as permitted by Section 8.9(e) of the Asset Purchase Agreement will proceed as scheduled. A hearing on the preliminary injunction has been set for May 18–19, 2017. The hearing will commence at 9:00 a.m. on May 18, 2017, at the Paul Brown United States Courthouse located at 101 East Pecan Street in Sherman, Texas.

**SIGNED this 16th day of February, 2017.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE