# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

REALPAGE, INC.; REALPAGE VENDOR  §
COMPLIANCE LLC                       §
                                          §    Civil Action No. 4:16-CV-00737
v.                                    §    Judge Mazzant
                                          §
ENTERPRISE RISK CONTROL, LLC;  §
LONNIE DERDEN                     §

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Plaintiffs' Application for Preliminary Injunction (Dkt. #10). After considering the relevant pleadings, exhibits, and argument at the preliminary injunction hearing, the Court finds Plaintiffs' motion should be granted in part.

## BACKGROUND

Lonnie Derden ("Derden") has been in the vendor compliance and tenant screening industry for sixteen years. In 1999, Derden created his own company, Resident Data. Derden sold Resident Data to Choice Point and became Vice President of the department at Choice Point. In 2005, Derden created Compliance Depot. Derden created Compliance Depot by using rules and code he found on the internet, six months of labor, and a $250,000 investment. By 2011, Compliance Depot had annual revenues of $6 million.

In 2011, RealPage Vendor Compliance LLC, a wholly owned subsidiary of RealPage, Inc. (collectively "RealPage") purchased Compliance Depot for nearly $24 million. As part of the Compliance Depot purchase, Derden and RealPage entered into three agreements: (1) the Asset Purchase Agreement ("APA"); (2) the Significant Owners' Agreement ("SOA"); and (3) the Employment Agreement. Each agreement contained non-competition, non-solicitation, and confidentiality agreements.

Tom Bean ("Bean") was one of Derden's long-time friends and colleagues. In early 2012, Bean left RealPage. Around May 2012, Bean decided to create a software consulting firm, IDC Software. In April 2012, Bean emailed another former RealPage employee, David Boyle ("Boyle") a "wish list" of equipment to support IDC Software's projects. Also in April 2012, Bean worked with a third former RealPage employee James Beavers ("Beavers") to obtain a quote for Dell computers, using Compliance Depot's account number. Derden provided the funding for IDC Software to purchase this equipment and software. On May 17, 2012, Bean received an employer identification number from the IRS. At this time, IDC Software had two projects, but focused primarily—if not exclusively—on getting "[Derden's] core software business developed." On May 19, 2012, Bean emailed Richard Wolff ("Wolff") and copied Boyle. Bean's email to Wolff contained several ".sql" files and instructed Wolff to "change table and column names and layouts so we aren't just copying what we did the first time." Derden agreed to pay Wolff $115,000 for this task. Over the next year, Derden was the sole source of funds for operating expenses, ultimately investing $160,000 in IDC Software.

In December 2012, Derden created Enterprise Risk Control, LLC ("Enterprise"). In July 2013, Derden purchased IDC Software's vendor compliance code and hired Bean as an employee of Enterprise. At that time, Bean uploaded his code onto Enterprise's servers. Bean continued to develop Enterprise's code until April 2017. Enterprise began marketing its product to potential customers in February 2014, and to its first multi-family customer in August 2015.

In February 2014, RealPage caught wind of Enterprise's new application and potential misappropriation of trade secrets. RealPage sent Defendants a cease and desist letter demanding assurances that Defendants were not soliciting RealPage clients and were not using RealPage secrets. Defendants responded with assurances that they did mistakenly approach a RealPage

client, but immediately backed off when they learned of the mistake. Defendants also assured RealPage that they did not have any trade secret information.

In April 2016, RealPage received more information that Defendants might be using trade secrets when a disgruntled ex-Enterprise employee, Cheryl Freudiger ("Freudiger") approached RealPage claiming that Enterprise gave her various trade secret materials. However, Freudiger did not produce corroborating evidence to RealPage until August 5, 2016. In early September, RealPage also received an email from one of its clients, explaining how Enterprise approached with a new vendor compliance application.

On September 23, 2016, RealPage filed suit against Derden and Enterprise asserting claims for misappropriation of trade secrets, breach of contract, and breach of fiduciary duty (Dkt. #1). On December 2, 2016, RealPage served Enterprise and Derden with its first set of requests for production. In its requests for production, RealPage requested, among other things, all of Enterprise's source code. Defendants produced all source code after early July 2013, but denied having access to any source code from before July 2013. Defendants based their position on Bean's declaration because he was the primary developer of code before July 2013. Bean swore under oath that when he left RealPage, he "did not take any of RealPage's confidential information" (Dkt. #21, Exhibit 3 at ¶ 4). On February 17, 2017, RealPage filed a motion to compel production of documents (Dkt. #40) followed two weeks later by a motion to compel computer images (Dkt. #49).

RealPage argued that there was an unexplained gap in the development of Enterprise's code. RealPage based this argument on several comments, visible in post-July 2013 code, that were made as early as July 2012. However, despite being able to see these comments, the code was not accessible. In response to RealPage's motions to compel, Defendants relied again on

Bean's sworn testimony that he did not take any confidential information with him and did not use any of RealPage's confidential information during his employment with Enterprise (Dkt. #44, Exhibit 2 at ¶¶ 6, 9, 11). Further, Bean swore that "[a]fter I transferred the earlier IDC code onto [Enterprise's] TFS server, I removed the previous work from the IDC computer I had been using because it was no longer 'my' code or 'IDC's' code – it was [Enterprise's] code" (Dkt. #44, Exhibit 2 at ¶ 8). Finally, Bean swore that he looked for remnants of Enterprise's source code from the IDC Software computer that he used before July 2013, but did not locate any (Dkt. #44, Exhibit 2 at ¶ 10).

Seemingly at a stalemate, the Court held that it could not order Defendants to compel what they did not have. However, finding that RealPage was entitled to verify Bean's allegations regarding the code's destruction, the Court ordered Defendants to produce mirror images of computers and storage devices used by Tom Bean in July 2013 (Dkt. #62 at p. 5). The Court limited the examination to determine if the source code was recoverable. If the code was not recoverable, the Court permitted the neutral forensic examiner to determine the details of any deletions so that RealPage could adequately cross-examine at trial.

The forensic examination conducted on April 6, 2017, showed that Bean did not delete the IDC Software code in July 2013 as he previously swore to. Instead, Bean destroyed thousands of files in September 2016, after RealPage filed this suit. The forensic examination also showed nearly 1,000 files deleted on April 3, 2017, after the Court ordered a forensic examination. In all, nearly 100,000 files were deleted from Enterprise's code since RealPage filed suit. Although the forensic exam shows which files were deleted, it cannot show any information about what the deleted code contained.

After the forensic examination, Defendants withdrew Bean's two declarations, which claimed that he did not take any RealPage information and that the Enterprise code was created without leveraging anything from RealPage. Bean has now admitted that he took a thumb drive with "everything" from RealPage and took the thumb drive home in April 2012.

In addition to Derden, Enterprise had six former RealPage employees: Bean, Beavers, Boyle, Linda Jones ("Jones"), Shawn Davis ("Davis"), and Michele Head ("Head"). Shortly after the forensic examination revealed Bean's misrepresentations to the Court, Enterprise terminated his employment. Enterprise spent approximately 9,500 development hours and $3.3 million creating its current product. Today, Enterprise provides vendor risk-management and credentialing services to school districts, restaurant chains, construction companies, homeowners' association management companies, commercial real estate, and multi-family properties.

On September 23, 2016, Plaintiffs filed suit against Derden and Enterprise asserting claims for misappropriation of trade secrets, breach of contract, and breach of fiduciary duty (Dkt. #1). On October 4, 2016, Plaintiffs filed their Application for Preliminary Injunction (Dkt. #10). On November 7, 2016, Defendants filed their response (Dkt. #21). On June 23, 2017, Plaintiffs filed a supplemental brief and exhibits (Dkts. #78–82). On July 3, 2017, Defendants filed their supplemental brief and exhibits (Dkts. #86–88). On July 12, 2017, Plaintiffs filed a supplemental reply (Dkt. #90). On July 13, 2017, the parties submitted joint deposition submissions in lieu of several witnesses' live testimony (Dkt. #92). On July 16, 2017, Defendants filed a supplemental surreply (Dkt. #93). On July 17, 2017, the Court held an evidentiary hearing. After the hearing, the parties submitted an admitted exhibit list (Dkt. #95).[1]

---

[1] The admitted exhibit list follows the same numbering as used throughout the depositions in this case. For ease, the Court's references to exhibits refer to those reflected on the admitted exhibit list (Dkt. #95).

**LEGAL STANDARD**

A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.* Nevertheless, a movant "is not required to prove its case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1985) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)). The decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

**ANALYSIS**

Before addressing the merits of RealPage's application for preliminary injunction, the Court will address Defendants' assertion of the equitable defense of laches. To establish laches, Defendants must prove that RealPage (1) delayed in asserting the rights at issue; (2) the delay is inexcusable; and (3) Defendants have suffered undue prejudice because of the delay. *Uptown Grill, L.L.C. v. Shwartz*, 817 F.3d 251, 256 (5th Cir. 2016). In the context of laches, prejudice means "defendant has done something it otherwise would not have done absent the plaintiff's conduct." *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir. 1985).

"The period for laches begins when the plaintiff knew or should have known of the infringement." *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998). The Fifth Circuit has devised a formula of "'LACHES = DELAY x PREJUDICE,' a factual calculation of

the trial court." *Gruma Corp. v. Mexican Rests., Inc.*, No. 4:09-cv-488-MHS-ALM, 2013 WL 12134147, at *8 (E.D. Tex. Sept. 27, 2013) (citing *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1162 (5th Cir. 1982)). "There is no bright-line rule on how long of a delay is sufficient to establish the defense of laches." *Id.*

Defendants argue that RealPage's claims are barred by laches because RealPage did not seek legal action for over two years after receiving Defendants' response to the cease and desist letter. Defendants argue that based upon RealPage's lack of action after its cease and desist letter, Defendants invested significant time and resources, totaling $3.3 million, in developing their application. RealPage argues that Defendants' unclean hands prevents them from asserting the laches defense.[2] RealPage also argues that it was justified in its delay until 2016 because Defendants represented in 2014 that they were not using trade secrets.

The Court finds that Defendants have failed to show a prima facie case of either unreasonable delay or undue prejudice.[3]

RealPage did not unreasonably delay in asserting its rights. The clock for laches can be stopped by a plaintiff's act showing intent to enforce its rights, such as by sending a cease and desist letter. *Gruma*, 2013 WL 12134147, at *8 (citing *Elvis Presley Enters.*, 141 F.3d at 206). RealPage sent Defendants a cease and desist letter on March 25, 2014, in which it raised concerns about Defendants soliciting RealPage clients and providing a multi-family real estate management service (Exhibit 4). RealPage demanded a comprehensive written response

---

[2] Defendants respond that RealPage has never raised unclean hands and therefore waived that defense. The Court need not reach this issue because the Court finds that Defendants have not established a prima facie case of laches.

[3] Defendants' cited cases do not persuade the Court. Defendants did not have to completely rebuild their infrastructure, RealPage did not make affirmative representations that they approved of Enterprise's application, and RealPage waited only a few months to file suit. *See Abraham v. Alpha Chi Omega*, 708 F.3d 614, 625 (5th Cir. 2013) (finding undue prejudice when defendant had to rebuild his business infrastructure twice because of fires); *Conan Props.*, 752 F.2d at 148 (5th Cir. 1985) (finding undue prejudice when plaintiff wished defendant success, took a photo with defendant, and signed the photo with "best wishes"); *H.G. Shopping Ctrs., L.P. v. Birney*, No. H-99-0622, 2000 WL 33538621, at *5 (S.D. Tex. 2000) (holding twenty-year delay was unreasonable).

"(i) detailing the specific nature of Enterprise's services . . ., and (ii) confirming that none of Enterprise's services is competitive to RealPage" (Exhibit 4 at p. 2). Defendants responded on April 1, 2014, unequivocally denying the allegations in the cease and desist letter and describing the accidental contact with one of RealPage's (although not Compliance Depot's) clients (Exhibit 5). Defendants' response was satisfactory. Therefore, the clock for laches did not begin.

Further, the clock did not start in April 2016 when Freudiger tipped off RealPage to potential trade secret violations. RealPage was reasonably skeptical of Freudiger's initial tip because she was a disgruntled ex-Enterprise employee (*See* Exhibit 177). Freudiger did not substantiate her claims with physical evidence until August 5, 2016. RealPage filed suit on September 23, 2016, one week after receiving an email from a Compliance Depot client about Enterprise's sales pitch. The Court finds that this period does not constitute unreasonable delay to support laches.

Defendants have not shown that they suffered undue harm due to the delay. Defendants assert that they expended additional time and resources to develop their application based on RealPage's implied acquiescence. However, Defendants do not substantiate this assertion. While Defendants claim that they expended $3.3 million in total to develop their application, they do not account for how much of that money was spent during the two years before the cease and desist letter. Therefore, the $3.3 million is misleading. Without any reference to what was spent before April 2014, Defendants have failed to meet their burden to show undue prejudice after their reliance.

For these reasons, Defendants fail to prove their affirmative defense of laches. The Court will now address the merits of RealPage's application for injunction.

## A. Likelihood of Success on the Merits

To prevail on their motion for preliminary injunction, Plaintiffs must demonstrate a substantial likelihood of success on the merits. This requires a movant to present a prima facie case. *Daniels Health Scis., LLC v. Vascular Health Scis.*, 710 F.3d 579, 582 (5th Cir. 2013) (citing *Janvey v. Alguire*, 647 F.3d 585, 595–96 (5th Cir. 2011)). A prima face case does not mean Plaintiffs must prove they are entitled to summary judgment. *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009).

### 1. Breach of Contract

Under Texas law, "[t]he elements of a breach of contract claim are: (1) the existence of a valid contract between plaintiff and defendant; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of the contract; and (4) the plaintiff's damage as a result of the breach." *In re Staley,* 320 S.W.3d 490, 499 (Tex. App.—Dallas 2010, no pet.). RealPage claims that it can establish each element. Derden argues that the noncompete is invalid because it is overly broad and that even if the covenant is valid, he did not breach the terms. The Court will address each argument in turn.

Covenants not to compete are generally disfavored by Texas courts. *Marsh U.S., Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011). However, the Supreme Court of Texas noted that the Texas Legislature enacted the Covenants Not to Compete Act to restore the well-established rule in Texas that non-competition clauses "pertaining to employment were not normally considered to be contrary to public policy." *Marsh*, 354 S.W.3d at 733 (alteration omitted). To be enforceable under Texas law, a covenant not to compete must be: (1) ancillary to or part of an otherwise enforceable agreement; (2) contain reasonable limitations as to time, geographical area, and scope of activity to be restrained; and (3) not impose a greater restraint than is

necessary to protect the goodwill or other business interest of the promisee. Tex. Bus. & Comm. Code Ann. § 15.50(a). Whether a noncompete is a reasonable restraint of trade is a question of law for the court. *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 388 (Tex. 1991); *Martin v. Credit Protection Ass'n*, 793 S.W.2d 667, 668–69 (Tex. 1990). Restraints are unreasonable if they are broader than necessary to protect the legitimate interests of the employer. *DeSantis v. Wakenhut Corp.*, 793 S.W.2d 670, 681–82 (Tex. 1990); *Henshaw v. Kroenecke,* 656 S.W.2d 416, 418 (Tex. 1983). Defendants do not contest the first element. Therefore, the Court will analyze only the final two elements.

Derden and RealPage entered into three agreements surrounding the purchase of Compliance Depot and Derden's subsequent employment with RealPage: The APA, SOA, and Employment Agreement.

Under the APA, Derden agreed that for a period of sixty months after the closing date, they would not "engage in the Business" (Exhibit 76 at p. 39). "Business" means "the Compliance Depot business, which provides vendor screening and compliance services" (Exhibit 76 at Annex I).

The SOA prohibited each owner from competing for a period of sixty months following the closing date. Derden promised in the SOA not to "become involved or otherwise engage, directly or indirectly, in a Competing Business" (Exhibit 77 at pp. 1–2). Derden further promised not to "directly or indirectly, advise . . . manage, operate, join, control, lend money or render financial, technical or other assistance . . . any Competing Business" (Exhibit 77 at p. 2). "Competing Business" means "the business of developing . . . databases and software applications which are competitive with products or services of [RealPage], are generally

referred to as 'single family or multi-tenant real estate management applications' and are generally used at apartment communities" (Exhibit 77 at p. 2).

Under the Employment Agreement, Derden agreed not to "use, disclose, reproduce, or distribute any of [RealPage's] Confidential Information." (Exhibit 78. at p. 8).[4] "Confidential Information" does not include information that is "readily accessible to the public" or information that is "a matter of common knowledge in the company's business[,] trade[,] or industry."

### a. Scope

RealPage argues that the definition of Competing Business is intentionally broad to include all multi-tenant property managers, including any multi-family, mixed-use, or commercial real estate managers. Derden argues that Competing Business is limited to business specifically with respect to single family or multi-tenant real estate management applications and to what is generally used at apartment communities by persons engaged in the operation and maintenance of apartments. Derden argues the scope must be narrow because Compliance Depot and RealPage were engaged only in apartments at the time of the acquisition. Thus, Derden argues that a broad reading would make the noncompete invalid in scope based on RealPage's lack of justifiable economic interest. The Court agrees with Derden.

The APA prevents Derden from engaging in the "Business," while the SOA prohibits Derden from being involved in a "Competing Business." Business is defined broadly to mean "the Compliance Depot business, which provides vendor screening and compliance services" (Exhibit 76 at Annex I). "Competing Business" has a narrower definition, and thus is the center of the parties' dispute.

---

[4] The Employment Agreement also contained a three-year covenant not to compete and non-solicitation agreement, which is not in dispute.

The definition of Competing Business uses parallel phrases beginning with "are" and coordinated with the conjunction "and." Phrases joined by coordinating conjunctions are usually treated as a single, compound unit. *ConocoPhillips Co. v. U.S. E.P.A.*, 612 F.3d 822, 839 (5th Cir. 2010) (citing Sidney Greenbaum, *The Oxford English Grammar* 233 (1996)). In a series of three phrases, "[t]he comma is often omitted on the assumption that it is not necessary, since the co-ordinator is sufficient to signal the coordination." Greenbaum, *The Oxford English Grammar* 234.

Based on this construction, Competing Business has three elements, each of which must be met. First, the software application must be "competitive with products or services of [RealPage]." Second, the software application must be "generally referred to as 'single family or multi-tenant real estate management applications.'" Third, the software application must be "generally used at apartment communities by personnel engaged in the operation . . . of apartment units."

The plain language of the SOA limited Competing Business to single family or multi-tenant apartment applications. The word "generally" does not expand this definition because the inclusion of "apartment units" at the end of the third element shows that this was limited to apartments.

The scope of the noncompete is reasonable. RealPage had a protectable economic interest in preventing competition for a reasonable amount of time from the multi-family, vendor compliance industry. RealPage had an interest in protecting its $24 million purchase, which included all of the intellectual property and associated goodwill of Compliance Depot. To protect this, RealPage could reasonably limit Derden and others associated with Compliance

Depot from developing a similar application or selling their expertise in such development for a reasonable period.

RealPage did not have a protectable economic interest in any broader definition. At the time of the acquisition, Compliance Depot was largely in the multi-family, apartment complex industry (Jason Lindwall ("Lindwall") Dep. at 44:12–16). RealPage did not work for school districts, the sports industry, or manufacturing (Lindwall Dep. at 45:9–21). RealPage's involvement in the commercial real estate industry was too small for Lindwall to recount. RealPage cannot have a protectable interest in industries where it does not sell any products. *Redi-Mix Sols., Ltd. v. Express Shipping, Inc.*, No. 6:16-cv-298-RWS-KNM, 2016 WL 7634050, at *8 (E.D. Tex. Dec. 2, 2016) (holding that the covenant prohibiting employee from contacting customers relating to industries which he did not participate was unreasonable); *Weber Aircraft, L.L.C. v. Krishnamurthy*, No. 4:12-cv-666, 2014 WL 12521297, at *8 (E.D. Tex. Jan. 27, 2014) (holding employer had no protectable interest in geographic area where employer did not sell any products); *Elec. Data Sys. Corp. v. Powell*, 524 S.W.2d 393, 398 (Tex. Civ. App.—Dallas 1975, writ ref'd n.r.e.) (holding appropriate remedy is to restrain the employee from working in the same computer field in which he was associated while employed). Therefore, RealPage's noncompete is limited to the multi-family, apartment complex industry.[5]

### b. Breach

RealPage argues that Derden breached the agreements by funding and directing IDC Software to create a vendor compliance application—before the expiration of the noncompete— which could be used in the multi-family industry. RealPage also argues that Derden breached his

---

[5] For the same reason, the definition of "Business" in the APA would be limited to the multi-family, apartment complex industry because that is what Compliance Depot was engaged in at the time.

confidentiality agreement by using RealPage's confidential information to develop IDC Software's competing application.

Derden argues that an employee has a constitutional right to prepare to compete with his employer before leaving his employer. Derden also argues that he did not solicit any of RealPage's customers, let alone multi-family clients of RealPage. Further, Derden argues that developing an application that could be used, but was not used, in the multi-family industry is not a violation of the noncompete.

Derden and RealPage agreed to a noncompete that included "developing . . . databases and software applications which are competitive with products and services of [RealPage]." This restriction lasted for sixty months. Derden does not object to the noncompete's time restriction. While Derden is correct in his claim that "to resign from one's employment and go into business in competition with one's former employer is, under ordinary circumstances, a constitutional right," this case is not an ordinary circumstance. *See Ledel v. Bill Hames Shows, Inc.*, 367 S.W.2d 182, 184 (Tex. Civ. App.—Fort Worth 1963, no writ) (referring to "ordinary circumstance" as one where the employer did not protect itself "for a reasonable time and within a reasonable area from such competition in the event the employer-employee relationships should be discontinued.").

Here, Derden signed a noncompete agreement that specifically prohibited development of competitive applications. Derden's noncompete was not premised on actual loss of customers to RealPage. Derden became involved directly in a Competing Business by advising, managing, and lending money or financial assistance to IDC Software, which created a competing application well before the noncompete expired. During the hearing, Derden admitted that the IDC Software application was capable of servicing the multi-family industry before the

noncompete expired. Therefore, Derden developed a competitive application during the restricted period, in violation of the noncompete.

Derden claims that he should not be held accountable for Bean's actions because Bean acted outside the scope of his employment. However, whether Bean took RealPage's trade secrets is irrelevant for breach of the noncompete. All that matters is that Derden "engage[d] in the Business" or "in a Competing Business." Derden promised not to direct someone to create a competing application. Nevertheless, Derden admitted that he hired IDC Software to create a vendor compliance application that could be used for servicing apartment complexes. IDC Software created that application. Whether Bean used trade secrets to accomplish this task does not matter. Bean created the type of application that Derden intended for him to create, and that application competed with RealPage. Therefore, Derden directed Bean to create a competing application, in violation of Derden's noncompete.

The only remaining question for the Court is whether Derden could cloak his "development" of a new application under the guise of a school district application in order to avoid the noncompete, only to market the same application to the multi-family industry shortly after the noncompete expired.

The only case cited by either party regarding development of a multi-faceted application is *Marcus v. Baker*, 221 S.W.2d 575, 576 (Tex. Civ. App.—El Paso 1949, no writ), cited by Derden. However, this case is inapposite. In *Marcus*, the buyer bought a deli located in the City Market. *Id.* at 575. As part of the sale, the seller agreed to not open a competitive business for one year and within one mile of the City Market location. *Id.* Five months later, the buyer closed the City Market location and built a supermarket—which included a deli—a mile and a half

from the City Market. *Id.* at 575–76. The seller then opened another deli within one mile of the City Market location. *Id.* at 576.

The court held that the new deli did not violate the noncompete because the City Market deli was the only business subject to the restrictive covenant. *Id.* Once the City Market closed, no business could be competitive with it. *Id.* Therefore, although the new deli was within the restricted area, other terms of the agreement rendered its existence harmless. *Id.*

Here, the evidence indicates that Defendants were developing an application that could be used in the multi-family industry immediately on May 5, 2016 (*See* Exhibits 88, 90). Derden admitted as much during the hearing. The Court does not need to analyze whether an application with a collateral use would be a violation of the noncompete because Defendants developed their application with the multi-family industry in mind. It was not simply an afterthought. RealPage has shown a likelihood of success on its breach of contract claim against Derden.

### 2. Misappropriation of Trade Secrets

A claim for misappropriation of trade secrets requires: (1) a trade secret; (2) misappropriation; and (3) use in interstate commerce. 18 U.S.C. § 1836(b)(1). Texas has adopted the Uniform Trade Secrets Act, which has similar elements to the federal act. *See* Tex. Civ. Prac. & Rem. Code Ann. § 134A.002; *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 874 (5th Cir. 2013). Under Texas law, a plaintiff needs to show use without authorization, but not that it was used in interstate commerce. *Wellogix*, 716 F.3d at 874.

A "trade secret" may consist of any formula, pattern, device, or compilation of information used in one's business, which the owner takes reasonable measures to keep secret, and which derives economic value from not being generally known by others in competition. *Id.* § 1839(3). The existence of a trade secret is a question of fact. *Wellogix, Inc.*, 716 F.3d at 874.

"Misappropriation" is satisfied if disclosure of the trade secret is made, without consent, by a person who acquired the knowledge under circumstances giving rise to a duty to maintain its secrecy. *Id.* § 1839(5). "Improper means" includes breach of a duty to maintain secrecy, but does not include reverse engineering or independent derivation. *Id.* § 1839(6). Misappropriation and improper means have the same definitions under the Texas and federal acts. *Compare* 18 U.S.C. § 1839 *with* Tex. Civ. Prac. & Rem. Code. § 134A.002.

Plaintiffs claim that their source code, database scripts, indexer, and backend application are its trade secrets. Enterprise disputes each element. The Court will address each in turn.

<u>a. Trade Secret</u>

RealPage contends that its software is a trade secret because it requires passwords to log in to computer systems, instructs employees to keep information secret, and has employees sign confidentiality agreements as part of their employment.

Enterprise responds that it used "off-the-shelf" technology to create its application. Enterprise further argues that RealPage's system architecture is not a trade secret because the public can easily derive the structure of its application by simply using the application or watching a 30-minute YouTube video. Enterprise also argues that RealPage did not act diligently in protecting its source code because it did not have protocols for investigating possible breaches.

RealPage has established a prima facie case that various components of its application are trade secrets. Enterprise's contention that the code could be created by analyzing RealPage's final product and stacking known technology on top of each other, or by watching a 30-minute YouTube video explaining how to use RealPage's application, is unavailing. The Fifth Circuit and Texas courts have repeatedly rejected such a contention. *E.g.*, *Tewari De-Ox Sys., Inc. v.*

*Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 613 (5th Cir. 2011) (citing *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1202 (5th Cir. 1986)); *Ventura Mfg. Co. v. Locke*, 454 S.W.2d 431, 433 (Tex. Civ. App.—San Antonio 1970, no writ.). Trade secret protection will be awarded to a trade secret holder against "the disclosure or unauthorized use by those to whom the secret has been confided under either express or implied restriction of nondisclosure or by one who has gained knowledge by improper means." *Phillips v. Frey*, 20 F.3d 623, 629 (5th Cir. 1994) (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974)).

Here, RealPage protected its trade secret information through confidentiality agreements, login credentials, passwords, firewalls, and requiring return of information upon termination. When RealPage first learned of a possible breach of confidentiality by Derden, it sent a cease and desist letter to Derden. Derden responded that he was not using trade secret information and was not competing with RealPage. RealPage relied on this representation until 2016 when more information became available. When RealPage received substantial evidence of a breach, it acted diligently to file suit and discover the extent to which Enterprise was using its trade secret information.

Although Compliance Depot had humble beginnings with only six months of development and $250,000 invested, the current application has been developed over eight years and into an asset worth $24 million at the time of its sale in 2011. Now, Compliance Depot generates $10 million in revenue each year. RealPage has shown sufficient evidence that the Compliance Depot application is a compilation that gives RealPage a commercial advantage over competitors who do not know its underlying software.

<u>b. Acquired Through Breach of Contract or Improper Means</u>

RealPage argues that Enterprise obtained trade secrets by improper means when Bean distributed Compliance Depot information to various members of Enterprise while he was still at RealPage (*E.g.*, Exhibits 13, 20, 23, 35, 37). RealPage imputes Bean's actions onto Enterprise because Derden was funding IDC Software and because Bean continued to develop Enterprise code while an Enterprise employee.

Enterprise responds that Derden did not set up IDC Software or otherwise act in concert with Bean. Enterprise contends that IDC Software is a legitimate, independent entity that still exists today. Enterprise denies that IDC Software was set up as a conduit for Derden to violate his noncompete. Finally, Enterprise argues that when Bean did send illicit information to Enterprise employees, he was promptly reprimanded.

The Court finds a likelihood that Enterprise obtained trade secrets through improper means. Derden and Bean discussed developing a "core business software" for a new vendor credentialing service while both were still employed at RealPage (Bean Dep. at 140:22–141:7; 141:22–142:6; 147:3–5). Bean put together a team of former RealPage employees including Boyle and Beavers (Bean Dep. at 117:4–118:6; 119:19–120:6; 123:4–10; 124:15–125:12; Exhibit 12–15; 8–10). Bean then created IDC Software, eventually consulting Derden about when to file the papers to register IDC Software as a limited liability corporation. On May 17, 2012, the same day that Bean resigned from RealPage, and while Derden was still at RealPage, Derden wrote a check for $30,000 to pay for IDC's computers, software, and Boyle's salary (Exhibit 191). Bean then recruited Wolff, and sent him various RealPage files with instructions to "change table names and layouts so we aren't just copying what we did the first time". Derden paid Wolff $115,000 to complete this task.

Over the next year, Derden was the sole source of funds for operating expenses of IDC Software, ultimately investing $160,000 in IDC Software (Bean Dep. at 101:23–102:23; 164:12–16). Derden also had control over the hiring and compensation of IDC Software employees (Exhibits 25, 28). During his deposition, Derden claimed that the amounts he paid were consulting fees owed to IDC Software, despite the fact that the checks are denoted as an "investment" and that Derden paid IDC Software before any of his commissioned projects began (*See* Exhibits 192–94).

Even though Defendants claim that they reprimanded Bean for sending RealPage documents, Bean continued to work for the people that he supposedly upset, sent many more RealPage documents, and was a developer of Enterprise's current code.[6] This is sufficient evidence that Enterprise obtained RealPage information by improper means.

### c. Actual Use

RealPage has little evidence of actual use of its source codes or trade secret materials. RealPage does have evidence, provided by Freudiger, that Enterprise possessed training manuals, vendor agreements, vendor lists, documents related to compliance verification, and development materials. Despite having little concrete evidence, RealPage argues that "use" can be implied from Enterprise's quick development of code and because Bean destroyed nearly 100,000 files since RealPage filed this suit.

Defendants argue that Bean acted as a lone wolf; that his code was scrapped shortly after uploading it to Enterprise's system because it did not work; and that a side-by-side comparison of RealPage's code and Enterprise's code shows almost no copying.

---

[6] Daniel Millstone ("Millstone"), Enterprise's Vice President of Engineering, testified that Derden hired him in August 2013 to develop a new multi-vertical vendor compliance application for Enterprise. Millstone evaluated IDC Software's code and determined that it was not acceptable for what he wanted to create. Millstone then scrapped most of the IDC Software code, but did not start over completely. Bean continued to develop the code along with other developers. Since RealPage filed this suit, Bean has deleted nearly 100,000 files associated with the code.

As a general matter, any exploitation of a trade secret that is likely to result in injury to the trade secret owner or enrichment of the defendant is a "use." *Wellogix*, 716 F.3d at 877. "Use" can be found where the exploitation includes "relying on the trade secret to assist or accelerate research or development." *GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 498 (5th Cir. 2016) (citing *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 721–22 (Tex. 2016)) (holding that Texas follows "traditional trade secret law"). "[P]roof of the defendant's knowledge of the trade secret together with substantial similarities between the parties' products or processes may justify an inference of use by the defendant." *Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 586, 601 (5th Cir. 2015). A factfinder may find use when "the defendant's product was quickly developed by someone who had recently resigned from the plaintiff-company." *Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259, 267 (5th Cir. 2014).

In addition to inferences arising from similarities in codes, a court may presume that destroyed information was unfavorable to the party responsible for its destruction. Fed. R. Civ. P. 37(e)(2). RealPage requests an adverse inference arising from Bean's destruction of nearly 100,000 files since the filing of this lawsuit to establish that Enterprise used RealPage's trade secrets in creating Enterprise's application. The party requesting an adverse inference must establish three elements: (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim. *Rimkus Consulting Grp., Inc. v. Commarata*, 688 F. Supp. 2d 598, 615–16 (S.D. Tex. 2010). Enterprise argues that Bean's

wrongful acts should not be imputed on Defendants because they were unaware and because Derden instructed Bean not to leverage RealPage information.

In order to impute Bean's acts onto Defendants, RealPage must prove that the acts were: (1) committed within the scope of Bean's general authority; (2) in furtherance of Defendants' business; and (3) for the accomplishment of the objective or purpose for which Bean was hired. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007).[7] Conduct that is of the same general nature as that authorized, or that is incidental to the authorized conduct, falls within the scope of employment even if the act is contrary to express orders. *Soto v. El Paso Nat. Gas Co.*, 942 S.W.2d 671, 681 (Tex. App.—El Paso 1997, writ denied) (finding fact issue relating to scope of employment because employee had history of abusing subordinates). An employee's intentional or criminal acts may be imputed to the employer when the acts are foreseeable considering the employee's duties. *Williams v. United States*, 71 F.3d 502, 507 & n.10 (5th Cir. 1995) (holding that it was foreseeable that Congressman would make defamatory remarks in response to questions by press). Whether the employee was acting within the scope of his employment and whether he deviated from his duties are questions of fact. *Durand v. Moore*, 879 S.W.2d 196, 199 (Tex. App.—Houston [14th Dist.] 1994, no writ).

Here, an adverse inference is appropriate and may be imputed on Defendants. Bean was acting within the scope of his employment for IDC Software when he stole RealPage trade secrets. The evidence shows that Derden had significant involvement in IDC Software from its inception in May 2012 and could foresee that Bean would steal RealPage trade secrets. Bean recruited Boyle to develop a "new" vendor compliance application. Bean sent various RealPage files to his recruited employees, including RealPage's scripts to create its databases, indices,

---

[7] The Court finds that Bean was an employee, rather than an independent contractor, at all times relevant to this litigation. *Texas A&M Univ. v. Bishop*, 156 S.W.3d 580, 584–85 (Tex. 2005); *Limestone Prods. Distrib., Inv. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002).

foreign keys, stored procedures, and functions (*E.g.*, Exhibits 13, 20, 23, 35, 37). Bean instructed Wolff to "change table names and layouts so we aren't just copying what we did the first time" (Exhibit 20). On June 15, 2012, Derden agreed to pay Wolff $115,000 to complete this task (Exhibit 23). Derden frequently consulted with Bean. Derden was the only source of operating funds for IDC Software. Bean regularly consulted Derden about financial decisions. The Court finds sufficient evidence to establish a prima facie case that Bean was acting within the scope of his employment when he took RealPage's trade secrets, and that even if Derden instructed him not to do so, Bean's contrary acts were foreseeable.

Derden claims that as of June 2012, he had not discussed his idea for Enterprise with Bean or with Boyle. Derden also claims that IDC Software is an independent business where the Enterprise application was just one of its projects. The Court does not find this to be credible. On June 8, 2012, Boyle emailed Bean and stated, "After we get Lonnie's core business software developed we need to get him on board with developing a generic Soft Phone product" (Exhibit 22). On June 15, 2012, Bean emailed Wolff and attached RealPage's "Database Scripts.txt," informing Wolff that Derden is "OK with paying you $115,000" (Exhibit 23). A month earlier, Bean had sent Wolff "create scripts" for RealPage's databases, and instructed Wolff to "change table and column names and layouts so we aren't just copying what we did the first time" (Exhibit 20). On August 15, 2012, Bean emailed Derden an IDC Software email account (Exhibit 25). On August 31, 2012, Derden emailed Gary Hofer, Boyle, and Bean in order to distribute contact information for the team (Exhibit 26). Substantial evidence suggests that Derden in fact had significant involvement in the management of IDC Software during the time that Bean took RealPage's trade secrets. This is contrary to Derden's testimony that he was

"a client" of IDC Software. Therefore, Bean's acts leading to an adverse inference may be properly attributed to Defendants, who benefitted from Bean's acts.

Finally, it is undisputed that Bean deleted nearly 100,000 files relating to the Enterprise application. A forensic examination showed that Bean's destruction of evidence began when RealPage first filed suit. Bean deleted more files after the Court ordered a forensic examination in March 2017. This destruction was prejudicial to RealPage because RealPage is now inhibited in showing similarity between early versions of the source code and the code that exists today. Although Enterprise's expert conducted a side-by-side comparison of the Enterprise and RealPage code, RealPage is inhibited in refuting this report because RealPage cannot access the underlying code that was part of the 100,000 missing files. Without information on the early versions of code, Enterprise could eliminate all evidence of misappropriation. Therefore, for purposes of the preliminary injunction, the Court will infer from the destruction of source code that those 100,000 files were harmful to Defendants' case. With such an inference, RealPage has established a prima facie case of misappropriation of trade secrets.

### B. Likelihood of Irreparable Harm

Plaintiffs must demonstrate they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "[H]arm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey*, 647 F.3d at 600. An injunction is appropriate only if the anticipated injury is imminent and not speculative. *Winter*, 555 U.S. at 22.

RealPage argues that it has been harmed because the breach of the noncompete and confidentiality provisions have allowed Enterprise to compete and win business immediately when the restricted period expired in May 2016. Derden responds that he did not win any

business from RealPage's clients, and therefore RealPage did not suffer any harm. Finally, Derden argues that even if RealPage has suffered harm due to the breach of noncompete, RealPage's delay in seeking injunctive relief shows that any harm is not irreparable.

The Court finds irreparable harm for breach of the noncompete. Defendants have benefitted from developing a competing application since 2012. The noncompete agreements did not allow development until after May 5, 2016. Defendants' acts have thus harmed RealPage in two ways. First, RealPage has been harmed because a competitor has been able to compete much sooner than the noncompete allowed. Second, RealPage has been harmed by Defendants' misappropriation by skipping over the time and expense necessary to develop a competitive product. *Halliburton Energy Servs., Inc. v. Axis Techs., LLC*, 444 S.W.3d 251, 260 (Tex. App.— Dallas 2014, no pet.).

Defendants argue that delay in bringing this suit shows any harm is not immediate or irreparable. Delay is only a factor in determining irreparable harm. *Fashion Week, Inc. v. Council of Fashion Designers of Am., Inc.*, No. 16-cv-5076 (JGK), 2016 WL 4367990, at *3 (S.D.N.Y. Aug. 1, 2016) (citing *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995)). With respect to delay, the relevant period begins when the plaintiff learned of the alleged infringing acts. *Tough Traveler*, 60 F.3d at 968. Here, the Court does not find that RealPage's delay in filing suit and obtaining a hearing were such that they negate irreparable harm.

RealPage first learned of possible violative acts in 2014. It sent Defendants a cease and desist letter and received an adequate response. This did not start the clock. RealPage then received a tip from a disgruntled, former Enterprise employee, Cheryl Freudiger, in April 2016. Freudiger expressed her disdain for Derden and Enterprise in an email to RealPage the next day

(Exhibit 177). At this point, the Court finds that RealPage would have reasonably waited to file suit in order to gather more credible evidence of Defendants' acts. It was not until August 5, 2016, when RealPage first received hard evidence of Defendants using RealPage's trade secrets (Exhibit 181). RealPage received an email in September 2016 that proved Defendants were engaging multi-family clients. RealPage filed suit a week later. The Court finds that the delay from August 5, 2016, when RealPage received its first piece of credible evidence, until September 23, 2016 was not unreasonable and does not weigh against a finding of irreparable harm.

### 1. Breach of Contract

RealPage's injury from Derden's breach of the noncompete is inherently irreparable. *Traders Int'l, Ltd. v. Sheuermann*, No. H-06-1632, 2006 WL 2521336, at *9 (S.D. Tex. Aug. 30, 2006) (citing *Am. Express Fin. Advisors, Inc. v. Scott*, 955 F. Supp. 688, 693 (N.D. Tex. 1996)). The purpose of a noncompete is to protect the employer's valuable asset for a reasonable period. Here, RealPage bargained for a five-year period in which Derden would not begin creating a competing application. Instead, Defendants began creating a competing application almost immediately. Derden still had four years left on his noncompete when he began directing, managing, and funding IDC Software. IDC Software sold its code to Enterprise, who launched its first application to a client in 2014. By 2016, Enterprise generated annual revenues of $6 million. As early as April 2016, Defendants began soliciting multi-family clients with plans to sign them as soon as Derden's noncompete expired (Exhibits 88, 90).

"The mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Janvey*, 647 F.3d at 600. Here, money damages may suffice to

repair some damage to RealPage. However, money cannot adequately account for the advantage Defendants gained by beginning development on a code four years before they agreed to do so.

## 2. Misappropriation of Trade Secrets

RealPage is being irreparably harmed by Defendants' misappropriation of trade secrets because Enterprise can improve on RealPage's trade secrets without first investing the time, expense, and labor necessary to produce a duplicate product. *Halliburton*, 444 S.W.3d at 260. When RealPage purchased Compliance Depot, it also purchased the intellectual property that went into creating the application. Although Derden was entitled to use his knowledge gained, he was not entitled to use the source code that made the application work.

RealPage is being harmed by Defendants' possession of RealPage's trade secret, which has allowed them to create a robust code developed on the back of RealPage. Defendants advertised to prospective clients that Derden was the founder of Compliance Depot, and advertised Enterprise's code as "the most advanced vendor compliance management system in the industry" (Exhibit 90). Once solicitation of clients began, the harm was done. *IDS Fin. Servs., Inc. v. Smithson*, 843 F. Supp. 415, 418 (N.D. Ill. 1994). Prospective clients may have begun to question the viability of RealPage's product without Derden. Under ordinary circumstances, this would be fair competition. However, Derden can only make these claims because Defendants unlawfully referenced RealPage's trade secrets. This cannot be undone by money alone. Any calculation of monetary damages would fail to fully appreciate the harm done by Defendants developing a robust product by skipping the necessary research and development undertaken by every other competitor. *Halliburton*, 444 S.W.3d at 260.

## C. Balance of Hardships

When deciding whether to grant an injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). Courts consider several factors in balancing the equities. Notably, courts consider the threat of disclosure of the trade secrets by defendants, *Cisco Sys., Inc. v. Huwaei Techs.*, 266 F. Supp. 2d 551, 555–58 (E.D. Tex. 2003), the size of competing companies and the portions of revenues each party derives from their respective software, *Hooters, Inc. v. City of Texarkana*, 897 F. Supp. 946, 949 (E.D. Tex. 1995), whether the injunction will effectively destroy a party's business, *Anadarko Petroleum Corp. v. Davis*, No. H-06-2849, 2006 WL 3837518, at *24 (S.D. Tex. Dec. 28, 2006), and whether denial will cause a loss of current market share or simply reduce prospects for expansion, *Flywheel Fitness, LLC v. Flywheel Sports, Inc.*, No. 4:13-CV-48, 2013 WL 12138593, at *4 (E.D. Tex. 2013). Here, the equities favor an injunction limited to the single family or multi-tenant industry.

RealPage is a large company with a market capitalization of $2.26 billion. Enterprise is a small company with fourteen employees. The Compliance Depot application markets to only single family or multi-tenant real estate managers and accounts for approximately $10 million of RealPage's revenue.

RealPage only participates in the single family or multi-tenant industry, with some participation in the commercial real estate industry. RealPage does not participate in the restaurant, school district, or sports industries. The Compliance Depot application is a small percentage of RealPage's total business. Enterprise generates about $6 million in revenue for its

entire application. Enterprise only has its one application. Thus, an injunction over Enterprise's entire application will effectively put Enterprise out of business.

Based on the comparative sizes, the portion of revenues each derives from the respective software, the fact that Enterprise could be put out of business, and the fact that RealPage is not currently operating in other industry verticals, the Court finds that the equities favor an injunction that is limited to the single family or multi-tenant real estate management industry.

### D. The Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger*, 465 U.S. at 312). This factor overlaps substantially with the balance-of-hardships requirement. *Id.*

According to Enterprise, a large number of its customers are school districts and government entities. If Enterprise is fully enjoined for any period, its customers will be left without vendor credentialing services. It is against the public interest to leave schools and government without important services. *TechRadium, Inc. v. Blackboard Connect, Inc.*, No. 2-08-CV-00214-TJW, 2009 WL 1152985, at *7 (E.D. Tex. Apr. 29, 2009). For this reason, in addition to those addressed in the balancing of equities, the Court finds that the public interest favors an injunction limited to the single family or multi-tenant real estate management industry.

### CONCLUSION

It is therefore **ORDERED** that Plaintiffs' Application for Preliminary Injunction (Dkt. #10) is hereby **GRANTED IN PART**.

It is further **ORDERED** that Defendants Enterprise Risk Control, LLC and Lonnie Derden, their officers, agents, servants, consultants, contractors, employees, attorneys, and any

person or entity in concert or participation with them, are hereby **ENJOINED** from offering Enterprise's vendor compliance application to any person or entity engaged in the single family or multi-tenant real estate management business.

It is further **ORDERED** that Defendants Enterprise Risk Control, LLC and Lonnie Derden have thirty (30) days for necessary transitions of any single family or multi-tenant real estate management clients. If Defendants require additional time to conduct necessary transitions, Defendants shall petition the Court accordingly.

It is further **ORDERED** that unless terminated earlier, this preliminary injunction shall expire upon the issuance of a final decision by the Court in this case.

It is further **ORDERED** that this case be submitted to mediation in accordance with Section 8.9 of the Asset Purchase Agreement. The parties shall participate in mediation with the Hon. Karen Gren Scholer, State District Judge (ret.), within the next thirty (30) days. The mediator's contact information is as follows:

> Carter Scholer Arnett Hamada & Mockler, PLLC
> Campbell Centre II
> 8150 N. Central Expressway
> Suite 500
> Dallas, Texas 75206
> (214) 550-4653
> kscholer@carterscholer.com

It is further **ORDERED** that this preliminary injunction shall not be effective unless and until Plaintiffs file an appropriate bond or cash deposit in lieu thereof in the amount of $10,000.

**SIGNED this 3rd day of August, 2017.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE